**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RONNY FERGUSON, ROGER MOELLMAN, AND STEVEN GIFFORD, on behalf of themselves and all others similarly situated,<br><br>  Plaintiffs,<br>  v.<br><br>RANDY'S TRUCKING, INC. AND RANDY GRIFFITH, and<br><br>  Defendants. | Case No.: 1:15-cv-000697 - JLT<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION<br><br>(Doc. 47) |

Roger Moellman and Steven Gifford assert Randy's Trucking Inc. and Randy Griffith, the President of Randy's Trucking, are liable for wage and hour law violations and unfair business practices.[1] Defendants argue Plaintiffs are unable to succeed on their claims for violations of Wage Order 16 because it does not apply to their employment. Therefore, Defendants seek summary adjudication of the claims related to Wage Order 16 pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 47) Plaintiffs filed their opposition to the motion on October 14, 2016 (Doc. 53) to which Defendants filed a reply on October 21, 2016 (Doc. 56).

The Court heard the oral arguments of the parties on November 7, 2016. For the reasons set forth below, Defendants' motion for summary adjudication is **GRANTED**.

---

[1] The claims of Ronny Ferguson were dismissed without prejudice on May 3, 2016. (Doc. 39)

1

**I.     Factual Background**[2,3]

Randy's Trucking, Inc. ("RTI") is a company that "transport[s] materials, such as water, mud, rock, gravel, sand, dirt, road base, heavy equipment, storage containers, mobile offices, and single wide trailer houses." (UF 1) "Although a significant number of RTI's clients are involved in the oil industry, RTI also provides trucking services for clients unrelated to the oil industry." (UF 2) RTI drivers "generally fall within three categories: 1) vacuum truck drivers, 2) winch truck drivers, and 3) crane operators." (UF 4)

Plaintiffs were formerly employed as drivers for RTI. (*See* UF 14, 36) According to Plaintiffs, they worked "onsite at various drilling locations assisting with drilling and extraction operations." (Doc. 22 at 3, ¶ 14) During the course of Gifford's employment with RTI, he drove "a vacuum truck, a winch truck, and a straight truck." (UF 15) Gifford estimated that while working for RTI, "60% of his time was spent driving a vacuum truck [and] 5-10% of his time was spent driving a winch truck." (UF 14) His "jobs varied from day to day," but each job was recorded on a time sheet. (UF 19-20) "Gifford hauled water, mud, KCL (a type of saltwater), and equipment to job sites," which were "up to 80 miles away." (UF 22, 23) "Gifford drove back and forth between jobsites multiple times in a single day, sometimes constantly or continuously." (UF 24) Gifford's assignments included work "for non-oil drilling clients," such as hauling water to Edwards Air Force Base, delivering cattle water, delivering "a tank to a hazardous waste facility," and hauling "river rock from Fresno to Reardon." (UF 31-35) For "every single job," he drove on a highway. (UF 21; Doc. 50 at 5-6, Gifford Depo. 35:22-36:7)

Moellman was hired by RTI "to be a 'vac truck driver,'" and his "job duties involved going to

---

[2] The parties failed to provide a "joint statement of undisputed facts" as ordered by the Court, and Defendants failed to "certify that the parties have met and conferred as ordered … or set forth a statement of good cause for the failure to meet and confer." (*See* Doc. 16 at 3) The failure to comply with the Court's order is not condoned. Counsel are cautioned that future failure to comply with the Court's orders may result in the imposition of sanctions, including motions being dropped from the Court's calendar.

[3] The factual background is a summary of the undisputed facts as well as the parties' contentions in this matter. Plaintiffs filed a response to the facts prepared by Defendants and many are not disputed. (*See* Doc. 53-1) As to some facts, Plaintiffs fail to identify evidence that establish that a dispute exists. Rather, Plaintiffs attempt to recast the asserted fact rather than simply addressing the fact as stated. For example, if the fact reads that the plaintiffs performed duties X and Y, it does not establish a dispute to demonstrate that they also performed duty Z. Given the failure to establish that a dispute exists, the Court has deemed these facts undisputed.

Any fact articulated by Defendants that is undisputed is identified as "UF." Plaintiffs' additional facts are identified as "PSF."

oil fields and transporting fluid back and forth between sites." (UF 36, 37) "When delivery kel water, or weighted water, Moellman would pick it up from RTI's yard or some third party and transport it to the customer." (UF 39) He "would then drive the truck to its destination, [and] off-load the fluid using the same hose and pump to expel the fluid from the truck." (UF 40) "Moellman testified that it 'should be a given' that he was not supposed to do anything at worksites other than transporting materials and pumping it in or out of his vehicle," and that everyone who worked as a driver for RTI should know that. (UF 49, 50) Moellman's assignments also included transporting "water for an environmental company who used the water to excavate trenches," operating "a winch truck to transport tanks," and moving "equipment from one location to another." (UF 41-43) Each job assignment—which varied in distance "from 7 miles one way to 250 miles one way— required Moellman to drive on a highway. (UF 57, 59; Moellman Depo. 136:23-35)

Both Plaintiffs drove to "oil well lease sites" for RTI. (PSF 68; *see also* Doc. 25-2, Moellman Decl. ¶ 4; Doc. 25-1, Gifford Decl. ¶ 1) Gifford completed "Joint Safety Assessments" (JSAs), which identify him as the "Crew Pusher." (PSF 72) On some of the JSAs, Gifford also signed the line for the "forman." (*See* PSF 72; *see, e.g.*, Doc. 53-8 at 20) However, the forms to not indicate what the title of "forman" meant to RTI, such as whether he was a supervisor of other drivers, whether this line was supposed to be completed by a supervisor at the location where he was making the delivery, or whether this had some another meaning. (*See id.*) Under the section entitled "sequence of basic job steps," Gifford indicated his work included:

- Spot truck at rig
- Get out of truck
- Place all safety equipment
- Hook up hose[;] push + pull loads

(*See, e.g.*, Doc. 53-8 at 18, 20) The safety equipment included: hard hat, safety shoes, safety glasses, hydrogen sulfide monitor, work gloves, fire extinguisher, tire chocks, cones, "lock/tag out" and "static line." (*Id.*; PSF 75)

Plaintiffs allege they spent "[a] significant portion" of their work "doing tasks other than driving a truck." (Doc. 22 at 3, ¶ 15) Rather, Plaintiffs contend "almost all their time was spent at drilling locations and not driving a truck." (*Id.*) Plaintiffs assert they "routinely worked hours in excess of 12

hours in a day," but "were only paid overtime after 40 hours in a week and were never paid double time." (*Id.*, ¶¶ 19-20)  Plaintiffs contend Defendants did not properly pay overtime wages and failed to pay wages due upon termination. (*See generally* Doc. 22)  Accordingly, Plaintiffs assert Defendants are liable for: (1) failure to calculate overtime pursuant to Industrial Welfare Commission Order No. 16-2001 ("Wage Order 16"), California Code of Regulations, Title 8, § 11160; (2) failure to pay wages due under Cal. Labor Code § 203; (3) failure to pay overtime in violation of 29 U.S.C. §§ 207 and 216; and (4) unfair business practices in violation of Cal. Bus. & Prof. Code §17200. (*Id.* at 8-12)

Defendants argue that Plaintiffs' claims fail to the extent they are based upon violations of Wage Order 16, asserting that Wage Order 9 applied to Plaintiffs' employment with RTI. (Doc. 47 at 8)  Therefore, Defendants seek summary adjudication of Plaintiffs' First Cause of Action, "as well as partial summary judgment on the Second and Fourth Causes of Action to the extent that they are derivative of the First Cause[] of Action." (*Id.* at 3)

## II.     Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment, or summary adjudication, should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial

responsibility" of demonstrating the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987). A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586 n.11; Fed. R. Civ. P. 56(c). The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court can only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Further, the evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

### III. IWC Wage Orders

The California Legislature created the Industrial Welfare Commission ("IWC") "to ascertain the wages paid, the hours and conditions of labor and employment in the various occupations, trades, and industries in which women and minors are employed in the State of California, and to make investigations into the comfort, health, safety and welfare of such women and minors." *Martinez v. Combs*, 49 Cal. 4th 35, 54 (2010). The power of the IWC was later "expanded … to include all employees, male and female, in response to federal legislation barring employment discrimination because of sex." *Id.* at 54 (citations omitted).

The IWC "was empowered to issue wage orders, which are legislative regulations specifying minimum requirements with respect to wages, hours, and working conditions." *Kilby v. CVS Pharmacy, Inc.*, 63 Cal.4th 1, 9-10 (2016). Thus, in California, "wage and hour claims are today governed by two complementary and occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the IWC." *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th 1004, 1026 (2012). Of these wage orders, there are "16 covering specific industries and occupations, one covering all employees not covered by an industry or occupation order, and a general minimum wage order amending all others to conform to the amount of the minimum wage currently set by statute." *Martinez*, 49 Cal. 4th at 57 (citations omitted). Specifically, Wage Order 9 applies to the transportation industry, while Wage Order 16 applies to "on-site occupations in construction, drilling, logging, and mining industries." Cal. Code of Regulations, Title 8, §§ 11090, 11160.

Courts show "extraordinary deference" to the IWC wage orders, "both in upholding their validity and in enforcing their specific terms." *Martinez*, 49 Cal. 4th at 61. California's Division of Labor Standards Enforcement ("DLSE") has issued opinion letters on the wage orders, which provide guidance to employers in applying the wage orders. "The DLSE's opinion letters, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Brinker*, 53 Cal.4th at 1029 n. 11; *see also Kirby*, 63 Cal. 4th at 13 (explaining the DLSE opinion letters are considered "with respect" and "may be persuasive," but "are not entitled to *deference* because they were not adopted in compliance

with the Administrative Procedure Act").

### A.     Wage Order 9

Wage Order 9 is intended "to apply to all persons employed in the transportation industry whether paid on a time, piece rate, commission, or other basis." Cal. Code of Regulations, Title 8, § 11090(1). The term "transportation industry" includes:

> **any** industry, **business**, or establishment **operated for the purpose of conveying persons or property from one place to another** whether **by** rail, **highway**, air, or water, **and all operations and services in connection therewith**; and also includes storing or warehousing of goods or property, and the repairing, parking, rental, maintenance, or cleaning of vehicles.

*Id.* § 11090(2)(N), emphasis added. This encompasses a wide-range of businesses, including, but not limited to: armored car services; car loading; car rentals; garages, whether for storage or repair; parking lots; tire aligning; trucking, "including commercial trucking of farm products;" "[e]xpress and parcel delivery companies;" and transportation companies. *See* Department of Labor Standards Enforcement, *Which IWC Order? Classifications*, p. 23 (2013) ("DLSE Pamphlet"), *available at* http://www.dir.ca.gov/dlse/ WhichIWC OrderClassifications.pdf.

### B.     Wage Order 16

Wage Order 16 addresses "On-Site Occupations in the Construction, Drilling, Logging and Mining Industries." Cal. Code of Regulations, Title 8, § 11160. Thus, the IWC indicated:

> **This order shall apply to all persons employed in the on-site occupations of** construction, including but not limited to work involving alteration, demolition, building, excavating, renovation, remodeling, maintenance, improvement, and repair work, and work for which a contractor's license is required by the California Business and Professions Code, Division 3, Chapter 9, Sections 7025 *et seq*.; **drilling, including but not limited to all work required to drill, establish, repair, and rework wells for the exploration or extraction of oil, gas**, or water resources; logging work for which a timber operator's license is required pursuant to California Public Resources Code Sections 4571 through 4586; and  mining (not covered by Labor Code Section 750 et seq.), including all work required to mine and/or establish pits, quarries, and surface or underground mines for the purposes of exploration or extraction of nonmetallic minerals and ores, coal, and building materials such as stone and gravel, whether paid on a time, piece rate, commission, or other basis…

Cal. Code of Regulations, Title 8, § 11160(1), emphasis added. Wage Order 16 includes a supremacy clause, indicating it "supersedes any industry or occupational order for those employees employed in occupations covered by this order." Cal. Code of Regulations, Title 8, § 11160(1)(F).

///

7

## IV. Discussion and Analysis

Defendants assert that Plaintiffs were covered by Wage Order 9, governing the transportation industry. (*See* Doc. 47 at 8-9)  Therefore, according to Defendants, Plaintiffs are unable to succeed on their First Cause of Action for a violation of Wage Order 16.  On the other hand, Plaintiffs argue "they are not covered by Wage Order #9 because they do not transport anything 'by rail, highway[4], air, or water," and "are also not usually driving their vehicles, but instead operating the pumps on the vehicles to move liquids relating to drilling operations." (Doc. 53 at 7, citing Doc. 22 at 3, ¶ 15)

### A. Drilling occupations

Plaintiffs argue their work for RTI completed falls under the "drilling" portion of Wage Order 16.  Cal. Code of Regulations, Title 8, § 11160(2)(E).  The DLSE determined this definition encompasses occupations such as: derrickman (derrick person), driller, electrician, field mechanic, floor hand – motorman, floor hand, lubeman (lube person), mechanic, operator, pipe racker, reservoir engineer, reliability specialist, rig operator (sometimes referred to as "head well puller"), rig supervisor, roughneck, tool-pusher, welder, and well puller.  DLSE Pamphlet at 31.  Further, in an e-mail opinion dated January 29, 2011, the DLSE indicated truck drivers may be subject to Wage Order 16, stating:

> **A driver will be subject to Order 16 if he** or she **operates on or at or in conjunction with a** construction, **oil drilling,** mining or logging **site or delivers materials or personnel from such a site to a location off the site which is owned, operated or controlled by a contractor or other employer engaged in work at the** construction, **oil drilling**, mining or logging **site or delivers materials or personnel from a location off site which is owned or operated by such a contractor or employer to the construction, oil drilling**, mining or logging **site**.

Department of Labor Standards Enforcement, *The DLSE Enforcement Policies and Interpretations Manual*, p.50-11, ¶ 50.9.7 (Mar. 2007) ("DLSE Manual"), *available at* http://www.dir.ca.gov/dlse/DLSEManual/dlse_enfcmanual.pdf .

#### 1. "On site" occupations

As an initial matter, the title of Wage Order 16 indicates that it addresses "on-site" occupations in the drilling industry.  Cal. Code of Regulations, Title 8, § 11160.  While the term "on site" is not

---

[4] The Court is at a loss as to how the plaintiff can make this argument within their obligations to the Court under Fed. Ri. Civ. P. 11 given their sworn testimony that they travelled on highways for every job. UF 21; Doc. 50 at 5-6, Gifford Depo. 35:22-36:7; UF 57, 59; Moellman Depo. 136:23-35.

defined in the order, the job examples given by the DLSE suggest that the term generally encompasses positions where the workers complete their work at the drilling location.

In contrast, here, it is undisputed that Plaintiffs drove from RTI to different locations. "Gifford drove back and forth between jobsites multiple times in a single day, sometimes constantly or continuously." (UF 24) His assignments included work "for non-oil drilling clients," such as hauling water to Edwards Air Force Base, delivering cattle water, delivering "a tank to a hazardous waste facility," and hauling "river rock from Fresno to Reardon." (UF 31-35) Thus, he drove "to jobsites up to 80 miles away." (UF 23) Likewise, Moellman's assignments included "going to oil fields and transporting fluid back and forth between sites," as well as transporting "water for an environmental company who used the water to excavate trenches," operating "a winch truck to transport tanks," and moving "equipment from what location to another." (UF 37, 41-43) He "drove to various different job sites… and the distance drive to those jobsites varied anywhere from 7 miles one way to 250 miles one way." (UF 59) If the distance was short, "Moellman made multiple trips back and forth hauling materials." (UF 62)

These undisputed facts alone indicate that Plaintiffs did not operate solely "on or at or in conjunction with [an] … oil drilling" site. Rather, they were required to come and go from the RTI yard to different locations, and "sometimes drove hundreds of miles a day." (*See* UF 60)

2.   Delivery of materials

a.   Materials transported by Plaintiffs

Plaintiffs assert their work was completed in conjunction with the drilling locations because "the water that they were delivering was primarily used in "kill well" operations – that is, to apply enough pressure to shut a well down." (Doc. 53 at 4) Moellman reviewed his time sheets, and explained that day he hauled water and pumped it "to kill the pressure coming out of the well." (Doc. 53 at 7, quoting Moellman Depo. 86:14-17) Plaintiffs also note that RTI's Safety Director, Randy Bunch, testified water delivered to oil rigs could be used for killing wells. (*Id.*, quoting Bunch Depo. 26:14-27:1)

In addition, Gifford testified he "would push and pull cement" and delivered water for cement jobs. (Doc. 53 at 9, quoting Gifford Depo. 318:21-319:10, 450:20-22) Gifford also used a winch truck

9

to move an oil rig "from one location to the next." (*Id.*)  He explained that it was his responsibility to "just transport it – this is in the field, off the road – to one lease across the street, like to the next lease, and drop all the equipment off and set it up for them." (*Id.* at 10, quoting Gifford Depo. 72:16-73:5)  However, Gifford clarified that he was only transporting the rig from location to location, while others set did the set up:

> Q. What would you move?  What did you move?
>
> A. Pumps, water tanks, the rig, sub bases, anything that had to do with the rig.
>
> Q. Okay.  And then whatever needed to be moved, you would hook up the winch to it, start the motor, it would be on the ruck, and you would transport it to wherever they needed it, right?
>
> A. Correct, yeah.
>
> Q. All right.  And then when you would arrive at the location that they needed it deposited at, you would -- tell me how you would take it off of the truck using the winch.
>
> A. Well -- pardon me -- wherever they needed it spotted.
>
> Q. Okay.
>
> A. There would be somebody on the next location, you'd pull up with the load or whatever, and they'd tell you to put it right here or right here.  They'd set up the rig the way they wanted to basically.
>
> Q. Okay.  And so you were just basically unloading it for them there so that –
>
> A. Yeah, placing it where they want it placed, yeah.
>
> Q. You've got to let me finish.
>
> A. Yes.
>
> Q. So when you're unloading it there, you're unloading it for them to set up; right?
>
> A. Correct.
>
> Q. Okay.  You don't actually take apart the rig before it is placed on your truck for transportation; correct?
>
> A. No, we don't touch the rig.  They do, the righands do.
>
> Q. Okay.  So I'm correct in saying that then; right?
>
> A. Yeah.
>
> Q. And then once you are done transporting the rig, you don't do anything to actually set it up; correct?

1       A.      Just put everything in place for them.

2       Q.      Am I correct you don't do anything to set it up once you're done transporting it?

3       A.      That's correct.

(Gifford Depo. 74:22- 76:14)  Thus, the testimony demonstrates he was responsible *only* for transporting rigs from location to location when that was his assignment—not for breaking down or any set up of the equipment.[5]

                b.      *Locations of the deliveries*

Significantly, the DLSE and IWC have indicated a distinction between on-site driving only and driving off-site.  For example, commercial logging trucks fall under Order 9, while only "on-site logging" work falls under Order 16.  DLSE Pamphlet at 23; *see also* Department of Labor Standards Enforcement, *The DLSE Enforcement Policies and Interpretations Manual*, p.50-11, ¶ 50.9.6 (Mar. 2007) ("DLSE Manual"), *available at* http://www.dir.ca.gov/dlse/DLSEManual/dlse_enfcmanual.pdf ("truck drivers hauling logs who are employed by firms that engaged in the transportation of logs are under Order 9").  Likewise, "a farm employee who delivers farm products to the first point of distribution is under Order 14 [agricultural occupations], but a trucking company which is in the business of trucking mostly farm products is under Order 9." DLSE Pamphlet at 24.  These examples clearly show that a transportation company, such as RTI, that is in the business of moving materials used in drilling operations—and does so off-site— does not fall under Wage Order 16.

Moreover, in the DLSE opinion letter, the DLSE indicated a driver "who is engaged in supplying materials or personnel to a contractor or other employer on a construction, oil drilling, mining or logging site **from an off-site location** not owned, operated or controlled by a contractor or other employer engaged in work at the construction, oil drilling, mining or logging site **will be covered by the IWC Order applicable to the industry in which he or she is employed**." DLSE Manual. P. 50-11, ¶ 50.9.7 (emphasis added).  Plaintiffs do not present any evidence that the driving or transportations occurred *only* upon the drilling locations they visited.  To the contrary, it is undisputed that "[w]hen delivering kel water, or weighted water, Moellman would pick it up from RTI's yard or

---

[5] Moreover, it is undisputed that "[w]hen asked whether he as ever performed oil-drilling related duties such as those associated with a 'derrickman' or 'driller,' Gifford testified that 'Randy's Trucking wasn't about that.  You're talking about a whole – different – deal.'"  (UF 29)

some other third party and transport it to the customer." (UF 39, emphasis added)  Similarly, even when transporting rigs, Gifford stated that he started the day at RTI and then drove to the location of the rig, transporting it to a different location for the RTI customer. (*See* Gifford Depo. 73:16-24)

On the other hand, as noted above, there was some evidence that on occasion, the plaintiffs moved fluids from one location on a site to a different location on the site, rather than moving fluids onto or off of a site.  In this way, the plaintiffs contend that they worked as "pump operators" rather than drivers.  However, of course, the plaintiffs testified that they merely operated the machinery on their trucks.  Connecting to the equipment of the site was the responsibility of the site's workers.  Even still, it does not appear that Wage Order 16 applies. The evidence demonstrates that RTI was not engaged in work at the drill site *other* than providing the transportation of the materials and the concomitant off-loading and loading tasks.  Department of Labor Standards Enforcement, The DLSE Enforcement Policies and Interpretations Manual, p.50-11, ¶ 50.9.6 (Mar. 2007) ("DLSE Manual"), available at http://www.dir.ca.gov/dlse/DLSEManual/dlse_enfcmanual.pdf  In addition, the time needed to complete these tasks, even if it far exceeds the amount of time needed to drive to the site, does not take the effort outside of Wage Order 9.  To the contrary, Wage Order 9 anticipates that it will apply to all tasks necessary to completing the transportation including "all operations and services in connection therewith.

**B.     Wage Order 9**

1.     Driving on highways

Plaintiffs argue the "transportation industry" wage order cannot apply because "the plain language of Wage Order #9 limits its application to 'any industry, business, or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air, or water.'" (Doc. 53 at 12, quoting Cal. Code of Regulations, Title 8, § 11090(2))  Significantly, however, it is undisputed that getting to and from "every single job," Gifford drove on a highway. (UF 21; Doc. 50 at 5-6, Gifford Depo. 35:22-36:7)  Likewise, each of Moellman's job assignments—which varied in distance "from 7 miles one way to 250 miles one way— required Moellman to drive on a highway. (UF 57, 59; Moellman Depo. 136:23-35)  Thus, Plaintiffs fail to show their driving and transporting property—though frequently related to the oil industry and frequently on private, unpaved

roads—does not fall under Wage Order 9.

### 2. The California Highway Patrol Exemption

Defendants contend that because Wage Order 9 applies, "it is undisputed that Plaintiffs fall within the scope of Wage Order No.9's 'California Highway Patrol Exemption,'" under which the order's "overtime provisions do not apply to 'employees whose hours of service are regulated by ... Title 13 of the California Code of Regulations, subchapter 6.5, Section 1200, and the following sections, regulating hours of drivers.'" (Doc. 47 at 13) Plaintiffs acknowledge that if Wage Order 9 applies, they "meet the requirements in terms of numbers and axels and gross vehicle weight rating" for the California High Patrol Exemption to apply. (Doc. 53 at 4)

Accordingly, having determined that Wage Order 9 applies to Plaintiffs' work at RTI, the California Highway Patrol Exemption also applies to Plaintiffs' claims for overtime pay.

## IV. Conclusion and Order

Taking the evidence in the light most favorable to Plaintiffs, the defendants have demonstrated that the plaintiffs were governed by Wage Order 9. For their part, the plaintiffs have not demonstrated that there exists a genuine dispute of material fact that would preclude judgment and fail to demonstrate that Wage Order 16 was applicable to their work at RTI. Consequently, Plaintiffs fail to demonstrate an essential element of their claim for a failure to pay overtime wages under Wage Order 16, and summary adjudication of the claim is appropriate. *See Celotex*, 477 U.S. at 322. Similarly, adjudication of the Second and Fourth causes of action—to the extent that they derivative of the First Cause of Action—is appropriate. Accordingly, Defendants' motion for summary adjudication is **GRANTED**.

IT IS SO ORDERED.

Dated:   **November 7, 2016**          /s/ Jennifer L. Thurston
                                        UNITED STATES MAGISTRATE JUDGE